UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAVID ROWE,

      Plaintiff,

v.                                                      Case No. 3:22-cv-310-MAP

COMMISSIONER OF SOCIAL SECURITY

      Defendant.

_____/

## ORDER

Plaintiff asserts that the Administrative Law Judge (ALJ) erred by failing to properly consider whether he met the requirements of Listing 12.05, and that the appointment of Andrew Saul as Commissioner of the Social Security Administration was constitutionally defective. Per the Court's order, the parties have now filed the supplemental briefs addressing whether the ALJ properly evaluated Plaintiff's claim through each step of the revised Listing 12.05, and whether substantial evidence supports his decision. *See* Order Requesting Supplemental Briefs, doc. 27. As the ALJ's decision was not based on substantial evidence, the Commissioner's decision is reversed and remanded.

*I.*    *Background*

Plaintiff, who was born in 1966, claimed disability beginning December 1, 2011 (Tr. 759). He has an eighth-grade education and has worked as a landscape laborer

and industrial cleaner (Tr. 406, 760).[1]  Plaintiff alleged disability due to bipolar, insomnia, anxiety, and schizophrenia (Tr. 404).  At his most recent hearing, Plaintiff testified that he was unable to afford Seroquel, the prescribed medication for his schizophrenia (Tr. 765-766).  Plaintiff stated that he last took Seroquel when he lived in Georgia with his stepfather; his stepfather purchased the medication on a sliding scale for $10.  Since relocating to Florida following his stepfather's death, he cannot afford this medication and is having difficulty sleeping and eating (Tr. 766).  As the ALJ summarized in his decision, "The claimant said that he hears things and calls the police.  He said he sometimes calls his stepbrother to talk him down. The claimant said he does not like being around a crowd or being in the dark.  He said he has problems with loud noises. He said a friend reads his mail" (Tr. 738).

Given his alleged disability, Plaintiff filed an application for SSI (Tr. 357-362, 363-370).  The Social Security Administration (SSA) denied Plaintiff's claim both initially and upon reconsideration (Tr.165-174, 176-191).  Plaintiff then requested an administrative hearing (Tr. 224-229).  Per Plaintiff's request, the ALJ held a hearing on May 28, 2014, at which Plaintiff appeared and testified (Tr. 43-99).  Following the hearing, the ALJ issued an unfavorable decision on September 25, 2014, finding Plaintiff not disabled and denying Plaintiff's claim for benefits (Tr. 192-209).  Thereafter, the Appeals Council vacated the ALJ's decision on January 28, 2015, and

---

[1] The ALJ concluded this work qualified as past relevant work (Tr. 746). Based on the same record, however, a prior ALJ concluded Plaintiff had no past relevant work (Tr. 34).

remanded the matter for further administrative action (Tr. 210-214). Following another administrative hearing before the same ALJ on October 8, 2015 (Tr. 140-164), the ALJ again found Plaintiff not disabled and denied his claim for benefits in a March 22, 2016, decision (Tr. 777-798). The Appeals Council denied review in an order dated October 20, 2016 (Tr. 799-804). Thereafter, Plaintiff filed an appeal in the United States District Court for the Middle District of Florida, case no. 3:16-cv-1532-DNF, and in an order dated February 21, 2018, the Court remanded with instructions that the ALJ re-evaluate whether Plaintiff meets Listing 12.05C (Tr. 808-816). On October 1, 2018, the Appeals Council vacated the administrative decision and remanded the matter for further proceedings consistent with the Court's order (Tr. 822-826). On February 4, 2020, the Plaintiff appeared for an administrative hearing before a new ALJ, and on February 25, 2020, the ALJ issued a decision finding Plaintiff not disabled and denying his claim for benefits (Tr. 733-755).

In rendering that administrative decision, ALJ Robert Droker concluded that Plaintiff had not engaged in substantial gainful activity since October 26, 2012, the application date (Tr. 736). After conducting a hearing and reviewing the evidence of record, ALJ Droker determined Plaintiff had the following severe impairments: borderline IQ, affective disorder, anxiety, and shortness of breath (Tr. 736). Notwithstanding the noted impairment, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 736). The ALJ then concluded that Plaintiff retained a residual functional capacity (RFC) to perform

medium work with additional limitations (Tr. 737-738).   Specifically, the ALJ indicated:

> He must avoid ladders or unprotected heights.  He must avoid the operation of heavy moving machinery. He must avoid concentrated exposure to dust, fumes or gases. He needs a low stress job with no production line.  He needs simple tasks. He must avoid contact with the public. He must avoid contact with coworkers (he needs tasks that do not require the assistance of others or require him to assist others in the performance of their tasks).

(Tr. 738).  In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 738).

The vocational expert testified that Plaintiff cannot perform his past relevant work as a landscape laborer and industrial cleaner (Tr. 746-747).  However, given Plaintiff's background and RFC, the VE testified that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as a Hand Packager, DOT # 920.587-018, SVP 2, unskilled, medium exertion, 50,000 positions in the national economy;  Laundry Worker, DOT # 361.684-014, SVP 2, unskilled, medium exertion, 49,000 positions in the national economy; and Labeler, DOT # 920.687-126, SVP 2, unskilled, 30,000 positions in the national economy (Tr. 747-748). Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled (Tr. 748).

Because Plaintiff's request for review was not filed in a timely manner, the Appeals Council denied review (Tr. 714-716), rendering the ALJ's February 25, 2020, decision the Commissioner's final decision (Tr. 714). However, an Administrative Appeals Judge later entered an order extending the time for Plaintiff to file a civil action (Tr. 709-713, 714-716). Plaintiff then filed a complaint with this Court (Doc. 1). The case is now ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3).

II.     *Standard of Review*

To be entitled to benefits, a claimant must be disabled, meaning the claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is an "impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

To regularize the adjudicative process, the SSA promulgated the detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. § 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 416.920(a). Under this process, the ALJ must determine, in sequence, the following: whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that

significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work. 20 C.F.R. § 416.920(a)(4)(i)-(iv). If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience. 20 C.F.R. § 416.920(a)(4)(v). A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 416.920(g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014); *Winschel*, 631 F.3d at 1178 (citations omitted);

*Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).   The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied.   42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

    III.    *Discussion*

        *A.  Listing 12.05*

Plaintiff originally complained in his memorandum of law that the ALJ erred by failing to properly evaluate whether he met Listing 12.05C's requirements.   In response, the Commissioner stated that because the SSA revised the medical criteria for evaluating mental disorders, including this Listing, on September 16, 2016, the ALJ did not need to consider whether Plaintiff satisfied Listing 12.05C's requirements. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016).   The SSA specified that its revisions will be applied in all new and pending Social Security cases, including cases on remand from a federal court, as of January 17, 2017. *Id*. at 66,138 & n.1.   The SSA instructed:

> … we will use these final rules on and after their effective date, in any case in which we make a determination or decision.   We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.   If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in that decision we make after the court's remand.

Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 & n.1 (Sept. 26, 2016).

Following these instructions, when the United States District Court issued its remand order on February 21, 2018, the post-January 17, 2017, revisions were in effect.[2]   Consequently, the ALJ on remand was required to apply the new rules, including the revised Listing 12.05.   *See Dames v. Comm'r of Soc. Sec.,* 743 F. App'x 370, 373 n.2 (11th Cir. 2018)[3] ("Upon receiving a case on remand, the Commissioner would apply the amended rules in its decisions."); *Trotter v. Saul*, case no. 2:20-cv-1760-MHH, 2022 WL 1129647 (N.D. Ala. 2022) (following *Dames*) ("Therefore, because Ms. Trotter's 2011 applications were before the ALJ on remand and because Listing 12.05 changed after Ms. Trotter filed her 2017 applications but before the ALJ rendered his decision, the amended version of Listing 12.05 governed the ALJ's analysis of Ms. Trotter's intellectual disability.").

In a May 8, 2023, Order, I found Plaintiff's request that the Court consider whether the ALJ reversibly erred by failing to evaluate Plaintiff's intellectual disability under Listing 12.05C inapplicable.   I requested a supplemental brief from Plaintiff

---

[2] Following remand, Administrative Appeals Judge Jeffrey Kirkwood issued an order "vacating the final decision of the Commissioner of Social Security and remand[ing] the case to an Administrative Law Judge for further proceedings consistent with the order of the court."  (Tr. 824, Order of Appeals Council, dated October 1, 2018).

[3] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

addressing whether the ALJ properly evaluated Plaintiff's claim through each step of the revised Listing 12.05 and whether substantial evidence supports his decision. My Order directed the Commissioner to file a reply brief limited in scope to address Plaintiff's supplemental brief. The parties filed supplemental briefs in accordance with this Order (Docs. 28, 29).

Plaintiff maintains in his supplemental brief that he meets or equals the requirements of Listing 12.05B. In pertinent part, this Listing provides:

12.05 Intellectual disorder (see 12.00B4), satisfied by A or B:

A. …
B. Satisfied by 1, 2, and 3 (see 12.00H):
  1. Significantly subaverage general intellectual functioning evidenced by a or b;
  a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
  b. …
  2. Significant deficits in adaptive functioning or currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning;
  a. Understand, remember, or apply information (see 12.00E1); or
  b. Interact with others (see 12.00E2)
  c. Concentrate, persist, or maintain pace (see 12.00E3); or
  d. Adjust or manage oneself (see 12.00E4); and
  3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Specifically, Plaintiff asserts his full-scale IQ score of 70 or below satisfies 12.05B(1); his significant deficits in adaptive functioning satisfies 12.05B(2); and his condition began before age 22, satisfying 12.05B(3) (Doc. 28). As a result, Plaintiff further asserts that remand is necessary because the ALJ failed to properly consider whether he met or equaled the

requirements of Listing 12.05B.  In response, the Commissioner states that the ALJ properly applied Listing 12.05B by properly finding the Plaintiff's IQ score of 69 was inconsistent with record evidence rebutting it and by finding that Plaintiff had not shown that he had the requisite deficits in adaptive functioning.  Against this backdrop, the Court is tasked with determining whether the ALJ properly applied the revised Listing 12.05, and whether substantial evidence supports his application.  I will discuss these separately below.

> 1. *Significantly subaverage general intellectual functioning evidenced by a full-scale IQ score of 70 or below*

Although the ALJ indicated that he "evaluated the claimant's impairments pursuant to Listing 12.05B," my review of his decision shows he skipped over discussing 12.05B1 (pertaining to IQ score) and jumped right into 12.05B2 (pertaining to deficits in adaptive functioning) (Tr. 736).  The Commissioner claims this omission is immaterial since the ALJ discussed Plaintiff's IQ later in the decision.[4]  In deciding

---

[4]  The ALJ discussed Dr. Maierhofer's IQ test (part of his August 2013 consultative psychological evaluation) and weighed in on its reliability and consistency.  The ALJ noted that Plaintiff's full scale IQ was 69, placing him in the mildly mentally retarded intellectual area; that Dr. Maierhofer indicated the IQ score was "valid;" that Dr. Maierhofer stated that the score seemed low in light of Plaintiff's previous employment, education, and possession of a driver's license; that Dr. Maierhofer opined that Plaintiff was functioning in the borderline area; and that Dr. Maierhofer diagnosed a psychotic disorder NOS, adjustment disorder with depressed mood, and borderline intellectual functioning (with more effort) (Tr. 742).  The ALJ stated:

> No weight is accorded to the IQ score of 69 because Dr. Maierhofer noted that the score seemed low in light of the claimant's previous employment, education and having a driver's license.  Additionally, Dr. Maierhofer noted that the claimant put forth limited effort in parts of the testing.  Dr. Maierhofer diagnosed the claimant with borderline intellectual

whether the ALJ erred in evaluating Plaintiff's impairment pursuant to Listing 12.05B, it is beneficial to review the SSA's proposed revisions to the Listings and its explanatory guidance set forth in 12.00, titled Mental Disorders. The SSA indicates it revised the criteria in final listings 12.05A and B in response to public comments that suggested "that we simplify the listing structure by guiding adjudicators through the process of identifying claimants who have intellectual disability. Importantly, and as noted above, the mental disorders listings are function-driven, not diagnosis-driven, and the final listing criteria reflect this approach."  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed.Reg. 66138-01, 66150.

In the revised Listing 12.05, the SSA added "see 12.00H."  *See* Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00H.  Titled "Establishing significantly subaverage general intellectual functioning," § 12.00H provides:

> … a qualified specialist must administer the standardized intelligence testing." [and that] "we generally presume that your obtained IQ score(s) is an accurate reflection of your general intellectual functioning, unless evidence in the record suggests otherwise."  Examples of this evidence includes:   a statement from a test administrator indicating that your obtained score is not an accurate reflection of your general intellectual

---

functioning (with more effort), which is inconsistent with the IQ score of 69. An IQ score of 69 is inconsistent with Dr. Maierhofer's finding that the claimant had a GAF score of 60, which indicates only moderate symptoms.  Although Dr. Maierhofer evaluated the claimant three years earlier, there was no allegation of mental retardation, nor did Dr. Maierhofer note any concerns about mental retardation, (Ex. 2F).  Dr. Maierhofer's opinion that the claimant could carry out basic job skills is accorded significant weight because that finding is consistent with the claimant's work history and the minimal and conservative course of treatment for mental impairments.

(Tr. 742).

functioning, prior or internally inconsistent IQ scores, or information about your daily functioning.  Only qualified specialists, Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that your obtained IQ score(s) is not an accurate reflection of your general intellectual functioning. This conclusion must be well supported by appropriate clinical and laboratory diagnostic techniques and must be based on relevant evidence in the case record, such as: (i) The data obtained in testing; (ii) Your developmental history, including when your signs and symptoms began; (iii) Information about how you function on a daily basis in a variety of settings; and (iv) Clinical observations made during the testing period, such as your ability to sustain attention, concentration, and effort; to relate appropriately to the examiner; and to perform tasks independently without prompts or reminders.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00H2a.[5]

---

[5] The SSA's Revised Medical Criteria for Evaluating Mental Disorders explains the addition of 12.00H:

> … we added a new section, final 12.00H, to organize and expand the guidance to adjudicators about how to evaluate a cognitive impairment under listing 12.05. We moved the discussion about standardized test scores into final 12.00H2 because only listing 12.05B requires standardized test scores.  Third, we revised the guidance to indicate that only qualified specialists, Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts, may conclude that an obtained IQ score(s) is not an accurate reflection of a claimant's general intellectual functioning. This change serves several purposes. It responds to the commenters' concern that proposed 12.00D gave an inappropriate amount of discretion to the adjudicators who do not have the expertise of the test administrators by permitting only the individuals who do have the expertise of test administrators to make conclusions about IQ scores. However, it also allows our agency's medical and psychological experts to reach different conclusions than those reached by the individual test administrator, when appropriate. This option is important because during our case development, we often receive a more complete picture of a claimant's functioning from a variety of sources of information other than the test administrator(s).

Even assuming that the ALJ properly considered Plaintiff's IQ score at step three (which is debatable), I find the ALJ's rejection of Dr. Maierhofer's IQ score unsupported by substantial evidence.  In affording "no weight" to Dr. Maierhofer's IQ score of 69, the ALJ cited Dr. Maierhofer's statement that the score seemed low given the claimant's previous employment, education, and possession of a driver's license (Tr. 742).  In his decision, the ALJ discussed only these jobs: Plaintiff's "work for four months doing golf course maintenance until he was fired because he overturned a leaf blower"; Plaintiff's intermittent construction and remodeling jobs for five to ten years; Plaintiff's valet parking job; Plaintiff's work cutting grass and raking pine straw for five different homes for five to eight years (Tr. 740, 741, 746 citing Ex. 2F and 4F).  As Plaintiff points out, official earnings records show he earned only $879 in 2001, $542 in 2002, $4,197 in 2008, and $1,337 in 2011 (Tr. 382-383).  And Plaintiff testified that his job at The Right Angle (that ended when he cut off his finger) was his sole full-time job (Tr. 69).  Plaintiff also testified that most recently he bundled and sold pine straw, earning $50-100 a month (Tr. 68).  In the decision before the Court, the ALJ, relying on the vocational expert's testimony, determined that Plaintiff has past relevant work as a Landscape Laborer and a Cleaner, Industrial (Tr. 746). The ALJ stated that Plaintiff performed these jobs "long enough … to achieve average performance, and … within the relevant period" (*Id*.).  As Plaintiff notes, the ALJ's finding is in direct

---

Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01.

contrast with the Plaintiff's testimony, the earnings records, and a previous administrative decision finding the Plaintiff had no past relevant work (Tr. 34). In short, the ALJ's conclusion that Plaintiff's IQ score is somehow at odds with his "previous employment" is troublesome.

Equally troubling is the ALJ's reliance on Plaintiff's education. It is undisputed that Plaintiff has an eighth-grade education and lacks a GED (Tr. 514). And although the Plaintiff reported to Dr. Maierhofer in 2013 that he "was in regular classes" (Tr. 528), the administrative record indicates in several places that Plaintiff was in special education classes. *See* Tr. 514, Dr. Maierhofer's 2010 report (indicating "[h]e said he was in special education classes"); Tr. 405, Plaintiff's Disability Report (indicating he attended special education classes from 1971-1977). When questioned at the administrative hearing about this discrepancy, the Plaintiff testified that he was in special education classes and that he may have told Dr. Maierhofer that he was in regular classes because he "may not have understood what Dr. Maierhofer was fully asking" (Tr. 117). He added that he could read and write "very little" (Tr. 57). The ALJ's reliance on the Plaintiff's education as a contraindicator to his IQ score is unpersuasive against the measuring stick of substantial evidence.

Thirdly, I find the ALJ unduly relied on the fact that Plaintiff has a driver's license. At the previous administrative hearing, the ALJ questioned Plaintiff about how he obtained a driver's license at age 16. Plaintiff testified that he passed on the first try but would have failed had he missed one more question and that one of the attendants at the testing center showed him how to operate the machine and read the

questions aloud to him (Tr. 63-64).   He also testified that he only drives locally and cannot drive longer distances as he gets distracted and loses concentration (Tr. 81, 765).   In light of this record evidence, I cannot find support for the ALJ's conclusion that the fact that Plaintiff is a licensed driver is inconsistent with his IQ score of 69.

As stated above, Listing 12.05B1 directs users to "see 12.00H;" 12.00H indicates that the SSA will "generally presume" that IQ testing by a qualified specialist (like Dr. Maierhofer) is "an accurate reflection of your general intellectual functioning, unless evidence in the record suggests otherwise."   20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 12.00H.   Section 12.00H provides "examples" of such record evidence.   One example of evidence suggesting an IQ score is not an accurate reflection of a claimant's IQ is when the test administrator "indicat[es] that your obtained score is not an accurate reflection of your general intellectual functioning." *Id*.   Test administrator Dr. Maierhofer opined in his report that Plaintiff "was not malingering or promoting his problems and the evaluation was valid.   He was, at times, vague, and he put limited effort into parts of the testing. The overall testing was seen as valid" (Tr. 529).   Dr. Maierhofer then noted that Plaintiff's "scores would place him in the mildly retarded intellectual area, and the scores appeared somewhat low given his previous employment, education, and having a driver's license" (Tr. 530)   Especially given the inconsistencies surrounding Plaintiff's employment, education, and driver's license, I do not think that Dr. Maierhofer's evaluation can be relied upon to "indicat[e] that [Plaintiff's] obtained score is not an accurate reflection of [his] general intellectual functioning."   Put simply, the ALJ substituted Dr. Maierhofer's conclusion (that

Plaintiff's low IQ score was valid) with his own conclusion (that it was not), and he did this notably without any contradictory medical opinion buttressing the rejection, which is what the listing requires.[6]

Another example of evidence suggesting an IQ score is not an accurate reflection of a claimant's IQ set forth in § 12.00H is "information about your daily functioning" 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 12.00H.  Moreover, in § 12.00H, the SSA offers the following guidance regarding who and how an IQ score may be found to be an inaccurate reflection of general intellectual functioning:

> Only qualified specialists, Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that your obtained IQ score(s) is not an accurate reflection of your general intellectual functioning. This conclusion must be well supported by appropriate clinical and laboratory diagnostic techniques and must be based on relevant evidence in the case record, such as: (i) The data obtained in testing; (ii) Your developmental history, including when your signs and symptoms began; (iii) Information about how you function on a daily basis in a variety of settings; and (iv) Clinical observations made during the testing period, such as your ability to sustain attention, concentration, and effort; to relate appropriately to the examiner; and to perform tasks independently without prompts or reminders.

Pt. 404, Subpt. P, App. 1, § 12.00H2.a.  In finding Dr. Maierhofer's IQ test score of 69 entitled to "no weight," the ALJ failed to cite to clinical and laboratory diagnostic

---

[6] In an earlier appeal, United States Magistrate Judge Douglas Frazier similarly found that remand was appropriate because substantial evidence did not support the ALJ's rejection of Dr. Maierhofer's IQ score finding.  *See* Doc. 13-9; Case no. 3:16-cv-1532-DNF at Doc. 23.  Judge Frazier opined: "The Court agrees with Plaintiff that if the ALJ was concerned with an apparent inconsistency with Dr. Maierhofer's opinion, then he should have sought to resolve the deficiency via medical evidence.  As it stands, the ALJ improperly rejected Dr. Maierhofer's evaluation results by substituting his lay opinion." *Id.*

techniques; data obtained in testing; or developmental history.[7]  The ALJ did cite "information about how [Plaintiff] function[s] on a daily basis" and "clinical observations made during the testing period, such as [Plaintiff's] ability to sustain attention, concentration, and effort; to relate appropriately to the examiner; and to perform tasks independently without prompts or reminders."  (Tr. 742).  Specifically, the ALJ cited to Dr. Maierhofer's statements in the report that Plaintiff's "concentration skills would be poor on a job" … that he would "have difficulty dealing with stress on the job because of reduced coping abilities" … and that "prognosis was limited for employment because of his depression, passivity and reported auditory hallucinations" (Tr. 742).  However, the ALJ failed to discuss Dr. Maierhofer's narrative report accompanying his IQ test that explained Plaintiff "could understand directions, but he required some supervision during the sample items of the Symbol Search subtest … he was slow at performing on all tasks presented … overall verbal comprehension skills were poor … both his short and long-term memory skills were

---

[7]  In deciding that Dr. Maierhofer's IQ score was entitled to "no weight," the ALJ also cited Plaintiff's GAF score.  He stated that "[a]n IQ score of 69 is inconsistent with Dr. Maierhofer's finding that the claimant had a GAF score of 60 [indicating] only moderate symptoms" (Tr. 742).  As Plaintiff notes, the DSM-V abandoned GAF scores and the Eleventh Circuit has held that GAF scores "have no direct correlation to the severity requirements of the mental disorders listings."  Doc. 28 at 6 citing *Wind v. Barnhart*, 133 F.App'x 684, 692 n.5 (11th Cir. 2005) (quoting 65 Fed.Reg. 50746, 50764–65 (Aug. 21, 2000) (noting that "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"); Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).

presented as poor, and he had trouble placing blocks together to form abstract patterns …" (Tr. 530).

Courts considering whether ALJs have improperly discredited IQ scores have held that for an ALJ to discredit an IQ score, the evidence must have "overwhelmingly indicated that the claimant [is] not mentally retarded and likely attempted to tailor results to effect a desired outcome." *Siron v. Comm'r Soc. Sec. Admin.*, 556 F. App'x 797, 799 (11th Cir. 2014) (citations omitted).   In this case, the ALJ assigned Dr. Maierhofer's IQ test result "no weight," stating it "seemed low in light of [Plaintiff's] previous employment, education, and having a driver's license" (Tr. 742).   As discussed above, I cannot conclude that Plaintiff's sparse employment record, eighth-grade education likely in special education classes, and possession of a driver's license "overwhelmingly" indicate he is not intellectually subaverage.

> 2. *Significant deficits in adaptive functioning currently manifested by extreme limitation or one, or marked limitation of two, of the following areas of mental functional: a) understand, remember, or apply information; or 2) interact with others; or 3) concentrate, persist, or maintain pace; or d) adapt or manage oneself* [8]

Plaintiff also maintains that the ALJ erred in concluding he has only moderate limitations in all four of the paragraph B areas of mental functioning.   The SSA defines a "moderate limitation" as "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."   20 C.F.R. Pt. 404, Subpt. P, App. 1, §

---

[8] Adaptive functioning "refers to how you learn and use conceptual, social, and practical skills in dealing with common life demands" as well as "your typical functioning at home and in the community, alone, or among others." Listing 12.00H(3)(A).

12.00F2c.  This definition is included in § 12.00F, a section titled "How do we use the paragraph B criteria to evaluate your mental disorder."  *Id*.  According to § 12.00F, the SSA "will determine whether you are able to use each of the paragraph B areas of mental functioning in a work setting.  We will consider, for example, the kind, degree, and frequency of difficulty you would have; whether you could function without extra help, structure, or supervision; and whether you would require special conditions with regard to activities or other people."  *Id.* at § 12.00F1.  In evaluating the paragraph B criteria, the SSA "use[s] all of the relevant medical and non-medical evidence in your case record to evaluate your mental disorder" … "information about your daily functioning can help us understand whether your mental disorder limits one or more … areas; and, if so, whether it also affects your ability to function in a work setting." *Id.* at § 12.00F3a-b.  The regulation further provides, "if you have difficulty using an area of mental functioning from day-to-day at home or in your community, you may also have difficulty using that area to function in a work setting.  On the other hand, if you are able to use an area of mental functioning at home or in your community, we will not necessarily assume that you would also be able to use that area to function in a work setting where the demands and stressors differ from those at home." *Id.* at § 12.00F3c.  Moreover, "the degree of limitation of an area of mental functioning also reflects the kind and extent of supports or supervision you receive and the characteristics of any structured setting where you spend your time, which enable you to function." *Id.* at § 12.00F3e.

Guided by the SSA's regulations, I must decide whether substantial evidence supports the ALJ's decision that Plaintiff has moderate limitations in all four of the paragraph B areas.  I will consider each of the four areas separately.

*a. understand, remember, or apply information*

In finding Plaintiff has a moderate limitation in his ability to understand, remember, or apply information, the ALJ stated only that "at most medical encounters and at the consultative psychological evaluations, the claimant had no difficulty following one and two-step instructions.  The claimant was able to describe his work history." (Tr. 736).   While the ALJ's observation may be correct, it is hardly representative of "all of the relevant medical and non-medical evidence in your case record" or the "information about your daily functioning."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F3a-b.  In other parts of his decision, the ALJ observed that Plaintiff offered conflicting and inconsistent reports about his past employment and whether he attended special education or regular class.   And the ALJ assigned "significant weight" to the opinions of Dr. Garmon, Ph.D., a SSA consultant, and Dr. Braun, an independent psychological expert that provided testimony at the most recent ALJ hearing, who opined that Plaintiff's ability to understand, remember and apply information was limited (Tr. 742, 744-745).  Dr. Garmon, relying on Dr. Maierhofer's report, opined that Plaintiff "can understand and remember simple instructions and procedures, but [] will have difficulty with detailed instructions and procedures" (Tr. 171).  Interestingly, the ALJ included a limitation to "simple tasks" in the RFC (Tr. 738).  Dr. Braun similarly testified that Plaintiff could perform simple repetitive tasks

in a setting where instructions are given an extra time or two, only occasional interactions with coworkers or public so that he is not distracted, and unlimited interactions with his supervisor who would maintain a check on him to assure he stays on task (Tr. 770).  These opinions are consistent with the opinion of Dr. Maierhofer that Plaintiff "could understand directions, but he required some supervision," that he "was slow at performing on all tasks presented," "overall verbal comprehension skills were poor," and "both his short- and long-term memory skills were presented as poor." (Tr. 530).  These opinions are also consistent with the opinion of Plaintiff's longtime girlfriend Jessica Williamson who explained, "A lot of times, I have to continuously remind him of the steps to completing certain tasks and tell him to focus on what he is doing and not on the distractions of his schizophrenia." (Tr. 422).  An example Ms. Williamson gave is Plaintiff's inability to make a pitcher of tea: "There have been times that David would boil tea bags for a pitcher of tea and go stare out a window or go around the house searching closets for people who do not exist.  Then I would go in the kitchen to a pan that had boiled dry and red hot.  I try to keep him out of the kitchen for everyone's safety." (Tr. 422).   Upon consideration of all the evidence, I cannot conclude that substantial evidence supports the ALJ's decision that Plaintiff has moderately limitations in the area of "understand, remember, or apply information."

*b. interact with others*

The ALJ opined that Plaintiff has a moderate limitation in his ability to interact with others.  Specifically, the ALJ explained:

> During the period under adjudication, the claimant lived with his girlfriend and children. The claimant lived with his late stepfather, and the claimant lived with his brother. The claimant testified that he is currently living with a family friend. The claimant told mental health professionals that he was arrested for physically assaulting his girlfriend, which resulted in an injunction for protection begin entered that prohibited him from having contact with his girlfriend and their children. The claimant reported to mental health personnel that he had some difficulty getting along with his brother. The claimant interacted effectively and appropriately with medical personnel and with the consultative evaluator. The claimant testified that he shops in stores. The claimant told Dr. Maierhofer that he did landscape work. These factors support the finding that his limitations are only moderate.

Tr. 736-37. Again, the SSA defines a "moderate limitation" as "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00F2c. The reasons cited above by the ALJ do not seem to describe an individual who can function independently, appropriately, and effectively on a sustained basis. Thus, I find that the record evidence does not provide substantial support for the ALJ's conclusion.

### c. concentrate, persist, or maintain pace

In considering Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ opined that Plaintiff had moderate limitations, citing his ability to "manage[] his medical, legal, and financial affairs" (Tr. 737). In support, the ALJ stated that Plaintiff "consents to psychotropic medication," "drives," and "is able to describe his symptoms and limitations." (Tr. 737). In the regulations, the SSA states that this area pertains to "the abilities to focus attention on work activities and stay on task at a sustained rate" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E3. In the decision, the ALJ noted Dr. Maierhofer's opinion that "claimant tends to be slow, passive and

unsure of himself," that his "concentration skills would be poor on a job," and that his "pace would be slow." (Tr. 742).   Similarly, the ALJ discussed a psychiatric assessment by Kristy Jackson in 2013.  Ms. Jackson opined that Plaintiff's "judgment, impulse control, memory, concentration, and attention were impaired" (Tr. 744). The ALJ also noted Dr. Braun's opinion that Plaintiff would need "instructions given more than once" (Tr. 745).  The ALJ did not discuss Dr. Braun's important opinion that Plaintiff was limited to only occasional interactions with coworkers or public so that he is not distracted, and unlimited interactions with his supervisor who would maintain a check on him to assure he stays on task (Tr. 770).  In light of all this, I cannot conclude that substantial evidence supports the ALJ's opinion that Plaintiff is only moderately limited in his ability to concentrate, persist, and maintain pace.

*d. adapt or manage oneself*

Lastly, the ALJ opined that Plaintiff has moderate limitations in adapting and managing oneself (Tr. 737).  The ALJ explained that "[a]t some medical encounters and at the consultative psychological evaluation, the claimant was disheveled and malodorous [h]owever he was appropriately dressed and groomed at some medical encounters."  The ALJ noted that "[a]lthough the claimant reported symptoms of depression, anxiety, and psychosis, his symptoms were generally well controlled at medical encounters." (Tr. 737).  Upon consideration, I find this analysis is not supported by substantial evidence.  The regulation specifies that this area of mental functioning refers to the ability to regulate emotions, control behavior, and maintain well-being in a work setting.  The Plaintiff's work record hardly depicts an individual

23

capable regulating his emotions, controlling his behavior, and maintaining well-being in a work setting.  One job ended when he cut off his finger; another job ended when he flipped over a leaf blower on a golf course (Tr. 68-70, 528).  The previous ALJ noted that Plaintiff's prior job as a router showed significant adaptive functioning (Tr 27).  Plaintiff's children were removed from his custody due to neglect, and he spent 30 days in jail and five years on probation related to an aggravated assault charge (Tr. 55, 527).  He also testified that as part of his probation he was ordered to take psychiatric medications and continue with psychiatric treatment (Tr. 78).  Against this evidence, I cannot conclude that Plaintiff's ability to "function in this area independently, appropriately, effectively, and on a sustained basis is fair."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F2c.  As a result, I cannot find substantial support for the ALJ's decision that Plaintiff is moderately limited in the area of adapting or managing oneself.

3. *The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22*

An IQ score of 60 through 70 establishes a rebuttable presumption that impairment was present before age 22 because IQ scores remain fairly constant throughout life, I need not address this requirement.  *Hodges v. Barnhart,* 276 F.3d 1265, 1268–69 (11th Cir.2001).  Because neither p arty asserts that Plaintiff's intellectual functioning changed after he reached the age of 22, I need not address the rebuttable presumption.

### B.  ALJ's authority

Plaintiff also asserts a constitutional challenge to the Commissioner's authority based on the Supreme Court case *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183, 2197 (2020), and argues that the statutory limitations in 42 U.S.C. § 902(a)(3) regarding the removal of the Social Security Commissioner violate the Separation of Powers Clause of the United States Constitution (Doc. 26 at 15-17).  In *Seila Law*, the Supreme Court found that the CFPB, an agency under the auspices of the Executive Branch, was headed by a single individual whom the President could remove only for cause and that this limit on the President's removal powers violated the Constitution's Separation of Powers Clause.  140 S.Ct. at 2191.  Relevant here, the Commissioner of Social Security, under 42 U.S.C. § 902(a)(3), is removable only for cause.  Relying on *Seila Law*, Plaintiff argues the statute is unconstitutional, and the government deprived this claimant of a valid administrative adjudicatory process. (Doc. 23 at 16).

The Commissioner agrees that, to the extent 42 U.S.C. § 902(a)(3) is construed as limiting the President's authority to remove the Commissioner without cause, the removal provision is unconstitutional (Doc. 26 at 13, citing Office of Legal Counsel, U.S. Dep't of Justice, *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Protection*, 2021 WL 2981542 (July 8, 2021)).  But, relying on *Collins v. Yellen*, 141 S.Ct. 1761 (2021), the Commissioner contends that even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the removal caused him or her harm, a showing Plaintiff cannot make (*Id.*).

Plaintiff's claim was adjudicated by an ALJ whose tenure was ratified by Commissioner of Social Security Andrew Saul.  Plaintiff has made no effort to show the unconstitutional removal provision caused him harm or affected the ALJ's decision in any way. Nor does Plaintiff show that but for the removal restriction, his claim would have been decided differently.  Absent such a nexus, Plaintiff's argument fails.  *See Collins*, 141 S. Ct. at 1789.   Courts within the Eleventh Circuit have repeatedly held that the separation-of-powers argument is meritless in this context. *Avalos v. Comm'r of Soc. Sec.*, No. 6:21-cv-290-LHP, 2022 WL 3867386, at *3 (M.D. Fla. Aug. 30, 2022); *Concepcion v. Comm'r of Soc. Sec.,* No. 6:20-cv-2057-EJK, 2022 WL 2292950, at *8 (M.D. Fla. Mar. 3, 2022); *Herring v. Comm'r of Soc. Sec.*, No. 2:21-cv-322-MRM, 2022 WL 2128801 (M.D. Fla. June 14, 2022); *Vickery v. Comm'r of Soc. Sec.*, No. 5:21-cv-122-PRL, 2022 WL 252464, at *3 (M.D. Fla. Jan. 27, 2022). Consequently, 42 U.S.C. § 902(a)(3) – the unconstitutional removal provision – did not affect Plaintiff's case and Plaintiff's constitutional challenge fails.

*IV.   Conclusion*

Accordingly, after consideration, it is hereby

ORDERED:

1.    The decision of the Commissioner is reversed and remanded for further administrative proceedings consistent with this Order; and

2.    The Clerk is directed to enter judgment in favor of Plaintiff and close the

case.

DONE AND ORDERED in Tampa, Florida, on this 27th day of July, 2023.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc:    Counsel of Record